Opinion by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge GEORGE.
OPINION
REINHARDT, Circuit Judge:
Kamalpal Singh, a 51-year-old native and citizen of India, petitions for review from the BIA’s denial of his application for asylum and withholding of removal based on imputed political opinion. Singh entered *1157 the United States in 2006 after fleeing egregious physical abuse by the local police in his town of Jullandar in the state of Punjab. Although the BIA affirmed the immigration judge’s (IJ) decision to grant Singh relief under the Convention Against Torture (CAT), it held that an imputed political opinion was not a central reason for the police brutality against him and denied his applications for asylum and withholding of removal. Relying in part on our decision in Dinu v. Ashcroft, 372 F.3d 1041 (9th Cir.2004), the BIA concluded that the Punjabi police had legitimate reasons for their arrest and detention of Singh. The government did not contest the IJ’s decision to grant Singh relief under CAT, and the BIA, accordingly, affirmed this portion of the IJ’s decision. We grant Singh’s petition and hold that the record compels the conclusion that Singh is eligible for asylum and entitled to withholding of removal.
I.
Singh’s troubles began shortly after his domestic servant, Jabed Khan, left for vacation and failed to return. After being introduced to Khan by a friend’s servant, Singh hired Khan to perform various domestic tasks, including caring for Singh’s mother, taking his children to school, running errands, and cooking for the family. Singh testified at his hearing that Khan was “a very nice man,” who “never abused anyone, [and] never used bad language.” Singh also testified that Khan received visitors who appeared to be Khan’s friends and relatives from his home state of Jam-mu and Kashmir. In addition to these visits, Khan occasionally used his vacation from work to visit his village for periods of a week to ten days. After two years of employment with Singh, however, Khan left for vacation and never returned.
Shortly after Khan’s departure in May 2006, the police came to Singh’s home and arrested him at around 4:30 in the morning. Four police officers took him to the police station and detained him for two days. They interrogated him about Khan, and told him that Khan was a Kashmiri terrorist. They then accused Singh of helping the terrorists and of knowingly employing Khan despite his connections to terrorism. They asked Singh what terrorist activities were being planned and accused him of being a “traitor” who was “working against the government.”
The police did not limit themselves to questioning, however. During the course of the interrogation, Singh was repeatedly subjected to egregious physical abuse. One officer grabbed his hair and struck him repeatedly in the face. The other officers then pushed him to the ground while one held his hands together and another restrained him by placing his knee on Singh’s neck. At the same time, another officer beat Singh with a bamboo stick and leather belt. The police beat him for ten to fifteen minutes at a time and then continued interrogating him. When Singh apparently persuaded them that he had no information to offer them, the officers stripped his pants off and used them as a pulley by which they hung him upside down until he lost consciousness. The police then alternated between hanging Singh upside down and beating him. He was beaten about five or six times during the course of his two-day detention.
Following the physical abuse and the extended questioning, the officers refused to let Singh go, and he was released only when his family and neighbors bribed them with 50,000 rupees.[1] The officers *1158 warned Singh not to talk about what had happened at the station. Once he was released, he was not able to walk because of the beatings and he had to seek medical attention. Singh’s doctor feared reprisal by the police, however, and refused to treat him at the hospital, instead going to Singh’s house to provide medical care.
A few weeks later, at four in the morning, the police returned to Singh’s home and arrested him a second time. The four officers began asking him about Khan again, and he told them that he had already given them all the information he had. The chief police officer slapped Singh and told the other officers to take him to the station to “make a man out of him there.” He was taken to the interrogation room, thrown on the ground, and beaten while the officers asked him questions about Khan’s whereabouts, his knowledge of terrorist activities, and his own role in assisting the terrorists. When he told the officers that he did not know anything, they threatened to kill him if he refused to answer. The officers again put Singh on the ground and beat him with a bamboo stick and leather belt. Over the course of his four days in detention, Singh was beaten eight to ten times. This time, Singh’s family bribed the officers with 80,-000 rupees in order to obtain his release.[2] Shortly after his second arrest and beatings, Singh fled to the United States.
During his hearing before the IJ, Singh testified that he feared returning to India because the police continued to look for him and to harass his family. Singh stated that the police went to his home 12 to 13 times after his departure for the United States. Once Singh had fled, the police targeted his wife, Sarpreet Kaur. They arrested her, took her to the police station, detained her for the night, and beat her. They asked her about Singh’s whereabouts and about his activities against the government. Singh’s family and neighbors bribed the police to have his wife released, this time paying 20,000 rupees.[3]
The facts described above are contained in Singh’s testimony before the IJ, who found his testimony to be credible. Nonetheless, the IJ denied Singh’s request for asylum and withholding of removal, because he concluded that Singh had not demonstrated a nexus between his persecution and a protected ground.[4] Relatedly, the IJ found that it was more likely than not that Singh would be tortured if returned to India and therefore granted his request for relief under CAT.
The BIA agreed with the IJ and affirmed his ruling that Singh had not established that an imputed political opinion was a central reason for his persecution by the Punjabi police. Relying in part on our decision in Dinu v. Ashcroft, the BIA held that the Indian government had a “legitimate reason to arrest, detain, and question” Singh, and that he was therefore ineligible for asylum. The government did not appeal the IJ’s determination that Singh was entitled to relief under CAT, and the BIA affirmed the portion of the IJ’s decision granting such relief. Singh filed a timely petition for review.
II.
We have jurisdiction over Singh’s petition for review under 8 U.S.C. § 1252. *1159 We review the denial of asylum or withholding of removal for substantial evidence. Kumar v. Gonzales, 444 F.3d 1043, 1049 (9th Cir.2006). “Under that standard, the BIA’s determination must be upheld if it is supported by reasonable, substantial and probative evidence from the record.” Id. Where, as here, the BIA adopts the reasoning of the IJ and adds additional reasons, we review both decisions. Lopez-Cardona v. Holder, 662 F.3d 1110, 1111 (9th Cir.2011).
A.
“It is settled law that an applicant may establish a political opinion for purposes of asylum relief by showing an ‘imputed political opinion.’” Kumar, 444 F.3d at 1053 (citation omitted). To demonstrate a nexus between Singh’s mistreatment and an imputed political opinion, Singh “must show (1) that ... his persecutors believed that he held ... a political opinion; and (2) that he was harmed because of that political opinion.” Baghdasaryan v. Holder, 592 F.3d 1018, 1023 (9th Cir.2010). Singh’s asylum application was submitted after the enactment of the REAL ID Act, and he must therefore demonstrate that an imputed political opinion was “at least one central reason” for his persecution. 8 U.S.C. § 1158(b)(l)(B)(i); see also Parussimova v. Mukasey, 555 F.3d 734, 740 (9th Cir.2008). Because the IJ and the BIA determined that Singh’s testimony was credible, we treat the facts to which he testified as true. See Cole v. Holder, 659 F.3d 762, 770 (9th Cir.2011).
The Punjabi police attributed a political opinion to Singh during their interrogation and abuse of him. Testimony regarding a persecutor’s statements serves as direct evidence that the persecution was motivated by a political opinion imputed to the applicant. See Hu v. Holder, 652 F.3d 1011, 1017-18 (9th Cir.2011); see also Li v. Holder, 559 F.3d 1096, 1111-12 (9th Cir.2009) (“Persecutors’ motivation should not be questioned when the persecutors specifically articulate their reason for attacking a victim.”). The police called Singh a “traitor” and repeatedly accused him of “working against the government.” Even after Singh departed, the police continued to attribute a political opinion to him in their statements. Singh testified that the police told his wife that Singh was a “dog” and asked her about his “activities against the government.” Such accusations of “acting against the government” constitute an imputed political opinion. See Hu, 652 F.3d at 1017-18. Because the inquiry in an imputed political opinion case focuses on the views of the persecutor, Garcia-Milian v. Holder, 755 F.3d 1026, 1031-32 (9th Cir.2014), Singh’s credible testimony regarding the police officers’ statements about him persuasively demonstrates that a central motive for persecuting him was that they believed that he opposed the government.
In addition to the direct evidence of his persecutors’ statements, the indirect evidence supports Singh’s testimony that he was persecuted because of an imputed political opinion. Singh testified that the Indian police were interested in him because of his relationship to Khan, his domestic servant. An “applicant’s association with, or relationship to, people who are known to hold a particular political opinion” may serve as indirect evidence of an imputed political opinion. Garcia-Milian, 755 F.3d at 1032 (quoting Navas v. INS, 217 F.3d 646, 658 (9th Cir.2000)) (internal quotation mark omitted). That appears to be precisely the case here. The Punjabi police asserted that Singh was a “traitor” based solely on his association with Khan, a reason we have repeatedly held to support the conclusion *1160 that a political opinion has been imputed to the applicant. See, e.g., Silaya v. Mukasey, 524 F.3d 1066, 1070-72 (9th Cir.2008) (holding that persecutors’ statements indicating that they had chosen her because of her father’s relationship to the Philippine government constituted persecution on account of an imputed political opinion). The police targeted Singh and imputed antigo-vernment views to him because of his relationship with another individual who they considered held antigovernment political beliefs.
Yet, under the facts determined to be true by the IJ and affirmed as such by the BIA, Singh was not a terrorist, nor did he engage in antigovernment activities. He testified that he had no association with terrorists and did not participate in any such activity. He also stated that he did not know anything about Khan or have any information regarding Khan’s involvement with terrorist activities. Taking Singh’s testimony as true, as we must, Singh was falsely accused of being a terrorist and holding antigovernment views because of his association with Khan. The Punjabi police beat him and hung him upside down until he lost consciousness because they imputed Khan’s alleged political beliefs to him. Under our cases, this constitutes a nexus to a protected ground. See Kumar, 444 F.3d at 1053-54. Indeed, Singh independently meets the causal burden imposed by the REAL ID Act: “[T]o demonstrate that a protected ground was ‘at least one central reason’ for persecution, an applicant must prove that such ground was a cause of the persecutor’s acts.” Parussimova, 555 F.3d at 741.
Our conclusion that the Punjabi police’s mistaken belief that Singh was a terrorist constitutes an imputed political opinion is supported by the legislative history of the REAL ID Act. The Act requires asylum applicants to demonstrate that the protected ground is “at least one central reason” for the persecution. Id. at 740. As the BIA has noted, Congress intended this amendment to eliminate the presumption previously applied by our court that persecution is politically motivated in the absence of any evidence of a legitimate prosecutorial purpose. See In re J-B-N- & S-M-, 24 I. & N. Dec. 208, 214 n. 9 (BIA 2007). The elimination of the presumption restored the law to its prior state: the burden is on the asylum applicant to offer evidence as to the persecutor’s motive.
Although the REAL ID Act was intended to overrule our “presumption,” it affirmed our prior imputed political opinion cases in an important respect. We had previously held that persecution based on the mistaken belief that the individual is a terrorist is persecution on account of an imputed political opinion. See, e.g., Kumar, 444 F.3d at 1054. In explaining its new standard, Congress explicitly reiterated that an applicant sufficiently shows a nexus to a protected ground when he provides evidence that law enforcement mistakenly believes him to be a terrorist. In explaining the effect of eliminating the presumption that persecution is the result of political opinion when there is no evidence as to the reason for the punitive treatment, Congress stated:
The “central reason” standard will eliminate this presumption, and require aliens who allege persecution because they have been erroneously identified as terrorists to bear the same burden as all other asylum applicants, that is, they will have to offer direct or circumstantial evidence of motive, in accordance with Supreme Court precedent.
H.R.Rep. No. 109-72, at 165 (2005), 2005 U.S.C.C.A.N. 240, 290. Thus, the difference under the REAL ID Act is that an applicant must now introduce evidence to *1161 demonstrate that he was wrongly accused of being a terrorist instead of relying on a presumption that he was persecuted on account of a political opinion when no evidence as to motive is presented. The House Report accompanying the REAL ID Act makes clear that, as long as the applicant meets his evidentiary burden, the mistaken belief that an individual is a terrorist constitutes a nexus to an imputed political opinion. As we have explained, in light of the IJ’s credibility finding, we take as true Singh’s testimony that he was not associated with terrorists and had not engaged in any terrorist activities. We also take as true his testimony that his persecutors wrongly accused him of working against the government and being associated with terrorists. Thus, under the standard approved by Congress in the REAL ID Act, Singh has demonstrated a nexus to an imputed political opinion.
Our decision in Dinu v. Ashcroft is not to the contrary, and the IJ and BIA’s reliance on that decision is misplaced. The facts and circumstances in Dinu are far different and of no relevance here. Dinu, who served in the military during the Romanian revolution, was arrested and investigated for his role in the massacre of civilians. 372 F.3d at 1044. He had been a member of a special security unit widely suspected of participating in the murders, which occurred in his hometown. Id. Dinu himself explained the justification for the Romanian investigation of him: he testified that “it was publicly known that the authorities concluded that the security units in those times were responsible for shooting in the people, so everybody, everybody believed that it was the security units that shot the demonstrators, and they were trying to find a guilty party.” Id. at 1045. Finally, Dinu offered no direct, or even indirect, evidence that his persecution was anything but a criminal investigation or that it was on account of an imputed political opinion. Id. at 1044-45.
Here, Singh has presented direct evidence that he was arrested and severely beaten on account of the political beliefs that the Punjabi police imputed to him, and there is no evidence that any investigation of him was conducted for any other reason. The only connection between Singh and any possible wrongdoing was the mistaken belief that because he hired Khan as a servant, he must be a terrorist. Because Singh has presented direct evidence that the Punjabi police mistakenly believed him to be a terrorist, and there is no evidence that Singh was the subject of a legitimate investigation based on other grounds, Dinu’s holding is of no relevance here.[5]
*1162 In sum, Dinu does not control this case.[6] Dinu is of little value in assessing asylum claims based on imputed political opinion. It applies only to cases in which an asylum applicant is the subject of a legitimate law enforcement investigation and offers no direct or indirect evidence that he is being subjected to harsh treatment on account of a protected ground.
Although there is little if any evidence that the police in Singh’s case were engaged in a legitimate investigation, even if the investigation were legitimate, Singh could establish a nexus in this case. We have held that, under the REAL ID Act’s standard, a persecutor may be motivated by more than one central reason, and “an asylum applicant need not prove which reason was dominant.” Parussimova, 555 F.3d at 741 (9th Cir.2009). Because mixed motive analysis exists in cases governed by the REAL ID Act, a petitioner may have been persecuted both because of legitimate investigatory reasons and because of his political opinion (imputed or actual), his religion, or other protected ground. The dissent seemingly fails to grasp this point.[7] In short, even if a petitioner’s persecution occurs during the course of a legitimate investigation or prosecution, neither -Dinu nor any of our other cases requires that the BIA or our court ignore direct or indirect evidence that a persecutor was also motivated to harm the applicant on account of a protected ground. Cf. Li, 559 F.3d at 1109 (recognizing that police may be motivated by both “prosecutorial aims and religious hatred” in a pre-REAL ID case). If a petitioner has presented evidence that an imputed political opinion was a central reason for the persecution, as Singh has here, then the fact that the persecution occurred during the course of a legitimate criminal investigation would not preclude eligibility for asylum.
For these reasons, we hold that the evidence compels the conclusion that a central reason for the physical abuse to which Singh was subjected was an imputed political opinion and that he has established a nexus between that abuse and a protected ground.
B.
Because the evidence compels the conclusion that Singh has established a *1163 nexus to a protected ground, the only questions remaining with respect to his asylum claim are whether the egregious physical abuse he experienced rose to the level of persecution and whether he has a well-founded fear of future persecution. Under most circumstances, we would be required to remand the matter to the BIA to make these determinations in the first instance. INS v. Ventura, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam); see also Hu, 652 F.3d at 1020 (remanding because the nexus inquiry and the persecution inquiry are “distinct”).
Here, as we held in Fedunyak v. Gonzales, 477 F.3d 1126 (9th Cir.2007), however, the posture of Singh’s case renders a remand unnecessary. Id. at 1130-31. As in Fedunyak, the IJ granted Singh relief under CAT and found that it was more likely than not that he would be tortured by the government, or with its acquiescence, if he returned to the country he fled. Id. The BIA affirmed this finding. The evidence that the IJ weighed to determine that Singh is more likely than not to be subjected to torture upon his return to India is the same evidence that Singh offered to establish his refugee status. Singh has met the high burden of demonstrating that he is likely to be tortured, so he necessarily meets the lower burden for eligibility for asylum that he has a well-founded fear of future persecution. See Nuru, 404 F.3d at 1228-29. Having established a nexus between his persecution and an imputed political opinion, and having established a well-founded fear of future persecution, a Ventura remand is unnecessary. Fedunyak, 477 F.3d at 1130-31. Thus, we remand to the BIA with instructions that the Attorney General exercise his discretion whether to grant asylum under 8 U.S.C. § 1158(b). Id. at 1131.
C.
Singh is also entitled to withholding of removal. In order to establish entitlement to withholding of removal, an applicant must show that it is “more likely than not” that he will be persecuted on account of a protected ground. Id. at 1130. The BIA has held that Singh is more likely than not to be tortured if returned to India. Given our holding on the nexus question, Singh has necessarily demonstrated that he is more likely than not to be persecuted on account of an imputed political opinion and is entitled to withholding of removal. Id. at 1130-31.
III.
We conclude that Singh’s credible testimony compels the conclusion that an imputed political opinion was a central reason for his persecution by the Punjabi police, and that he has a well-founded fear of future persecution. Accordingly, we remand this case to the BIA with instructions that the Attorney General exercise his discretion whether to grant Singh asylum. We also remand for an order withholding removal of Singh and granting' relief under the Convention Against Torture.
The petition for review is GRANTED and REMANDED for the purposes described in the above opinion.

. In 2006, 50,000 rupees was the equivalent of approximately $1,100. At the time, Singh’s yearly salary appears to have been around 95,000 rupees.

. In 2006, 80,000 rupees was the equivalent of approximately $1,750.

. In 2006, 20,000 rupees was the equivalent of approximately $440.

.Singh originally claimed that he had been persecuted on account of his religion, his membership in a particular social group, and an imputed political opinion. His petition for review concerns only his claim of an imputed political opinion.

. The government also relies on Sharma v. Holder, 633 F.3d 865 (9th Cir.2011). That case is not controlling here for the same reason that Dinu does not control. In Sharma, the court stated that "the motivation of the police was clear: stop Sharma's father from publishing his book. The police never inquired into Sharma's own political views. When they picked him up, their sole inquiry pertained to the status of his father’s book.” 633 F.3d at 870. Moreover, the court dismissed Sharma's contentions that the police imputed his father's beliefs to him as "isolated” and "hearsay,” and thus entitled to “less weight than the other evidence in the record.” Id. at 877 & n. 1. Here, in contrast, the IJ found Singh’s testimony and his application as a whole to be credible, and the references to Singh's own political opinion were far from isolated; the police repeatedly asked Singh, and later his wife, about Singh’s own work against the government. The BIA also relied on its own decision in Matter of R-O-, 20 I. & N. Dec. 455 (BIA). In Matter of R-O-, however, the BIA again ultimately concluded that "there is no evidence that the respondent has received any threats from the Government on the grounds of political opinion....” Id. at 459.

. Although we have stated that a lack of proper procedures and the use of torture may render law enforcement activities illegitimate, we need not consider those questions here. See Li, 559 F.3d at 1109 (lack of proper procedures); Nuru v. Gonzales, 404 F.3d 1207, 1223-24 (9th Cir.2005) (torture). Nor need we consider that Dinu was a pre-REAL ID Act case while this case is post-REAL ID. Instead, what matters is that in Dinu there was no evidence that the asylum seeker was beaten on account of his political opinion while the evidence is unrefuted that such was the cause of the brutal physical assaults on Singh.

. Contrary to the dissent, we hold that irrespective of any other reason for the police's persecution of Singh, the evidence compels the conclusion that one central reason for the persecution in this case was the belief on the part of the police that Singh held an antigo-vernment political opinion. That is the only reasonable justification for why the police called him a "traitor,” accused him of "working against the government,” and interrogated his wife regarding his "activities against the government.” To the extent that the dissent makes the extraordinary claim that the police could not have imputed a political opinion to. Singh because they interrogated him for information about Khan, such a claim is flatly at odds with our precedent. See, e.g., Kumar, 444 F.3d at 1047, 1053-54 (finding a nexus to an imputed political opinion in a case in which the officers told the petitioner that "he would be killed if he did not disclose the identities of Muslim terrorists and reveal information about their planned terrorist activities,” id. at 1047).