**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HAYK KHUDAVERDYAN; NADEZHDA KHUDAVERDYAN, *Petitioners*, v. ERIC H. HOLDER, JR., Attorney General, *Respondent*. | No. 10-73346 Agency Nos. A099-901-673 A099-901-674 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted October 10, 2014*
Pasadena, California

Filed February 27, 2015

Before: Andrew J. Kleinfeld, Susan P. Graber,
and John B. Owens, Circuit Judges.

Opinion by Judge Graber;
Concurrence by Judge Owens;
Dissent by Judge Kleinfeld

---

* The panel unanimously concludes that this case is suitable for decision
without oral argument. Fed. R. App. P. 34(a)(2).

# SUMMARY**

### Immigration

The panel granted, in part, a petition for review of the Board of Immigration Appeals' denial of asylum and withholding of removal, holding that the Board erred by failing to consider whether the lead petitioner had established the requisite nexus to a protected ground based on his imputed whistleblowing, and denied the petition, in part, holding that substantial evidence supported the denial of petitioner's claims based on actual political opinion, as well as the denial of petitioner's claims under the Convention Against Torture.

The lead petitioner asserted that the Armenian military police detained, beat, and threatened him after he was seen talking to a reporter following a personal confrontation with the city's military police chief. The panel held that substantial evidence supported the Board's conclusion that petitioner was not an actual whistleblower, but the Board's analysis was incomplete, because it failed to address whether he was harmed on account of an imputed political opinion, or his imputed whistleblowing. The panel explained that an applicant may demonstrate persecution on account of imputed political opinion if he or she shows that the persecutor thought that the applicant was attempting to expose corruption in a governing institution and mistreated the applicant as a result, even if the applicant in fact had no such intention.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that substantial evidence supported the denial of CAT protection, and it remanded the asylum and withholding claims for further proceedings.

Concurring, Judge Owens wrote separately to emphasize that the United States Department of Justice's position in this and other immigration cases clashes with its own campaign against foreign corruption.

Dissenting, Judge Kleinfeld wrote that the Board did consider petitioner's claims based on imputed political opinion or imputed whistleblowing, and that the evidence does not compel the conclusion that petitioner was persecuted on that or any other protected basis.

**COUNSEL**

Yeznik O. Kazandjian, Glendale, California, for Petitioners.

Yanal H. Yousef, Trial Attorney, Ernesto H. Molina, Jr., Assistant Director, Office of Immigration Litigation, and Tony West, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

Elizabeth A. Lopez, San Diego, California, for Amicus Curiae Casa Cornelia Law Center.

**OPINION**

GRABER, Circuit Judge:

Petitioners Hayk and Nadezhda Khudaverdyan seek asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, 1465 U.N.T.S. 85. The Armenian military police detained, beat, and threatened Petitioner[1] after he was seen talking to a reporter following a personal confrontation with the city's military police chief. The Board of Immigration Appeals ("BIA") held that, because Petitioner failed to prove that he intended to expose corruption when he talked to the reporter, he did not demonstrate that he was persecuted because of his *actual* political opinion. The BIA further held that Petitioner failed to show that his mistreatment at the hands of the military police rose to the level of torture within the meaning of the CAT. Although we find no error in those rulings, the BIA failed to address evidence in the record that Petitioner was persecuted on account of an *imputed* political opinion, that is, because military police officials *thought* that he was talking to the reporter in an attempt to expose government corruption. That failure is an error of law. Accordingly, we grant the petition for review in part, as to the asylum and withholding claims,

---

[1] Because Petitioners' claims rest wholly on Hayk Khudaverdyan's treatment at the hands of Armenian governmental officials, the singular "Petitioner" refers to him.

and remand to the BIA for further proceedings consistent with this opinion.**[2]**

## FACTUAL AND PROCEDURAL HISTORY

Petitioners are citizens of Armenia who seek asylum, withholding of removal, and protection under the CAT. The immigration judge ("IJ") expressly found Petitioner credible, and the BIA did not disagree, so we accept his testimony as true. *Cole v. Holder*, 659 F.3d 762, 770 (9th Cir. 2011).

Petitioner's problems began with a confrontation with the Armenian military police chief in Petitioner's home city. While dining with friends at the hotel where Petitioner worked as a manager, the police chief complained about the food and the service. When Petitioner defended himself and his staff, the police chief's bodyguards took Petitioner outside and beat him.

About a week later, a reporter approached Petitioner and asked about the incident involving the police chief. Petitioner testified that the reporter worked for a print publication called "A Plus One." A United States Department of State Country Conditions report, included in the record, identified "A1 Plus" as an "opposition" news outlet in Armenia. The IJ found that, although it was not certain that the two were the same news agency, it is "unlikely" that there would be two Armenian opposition news agencies with such similar names.

---

**[2]** We express no view on the merits of Petitioners' claims, which the BIA must address in the first instance. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–18 (2002) (per curiam) (holding that a court of appeals should remand, rather than review the record and decide an issue on the merits, when the BIA has not yet considered that issue).

Petitioner told the reporter that he could not talk about the incident at that time and arranged to meet her the next day. At that second meeting, the reporter told Petitioner that she was preparing an article about the leading officials in the Armenian government—an important topic, she said, because of upcoming elections. She tried to convince Petitioner to give her information about his altercation with the police chief. She argued that, if stories like his did not come to light, the country would remain in a "bad situation with its people." Petitioner told the reporter that he was too frightened to help her, and he left the meeting.

Immediately after the second meeting with the reporter, two men forced Petitioner into a black car. Petitioner was detained overnight in a dark room at the military police station. The next morning he was interrogated, beaten, and accused of espionage. He was then taken to meet with the chief of the military police's investigative department. The investigative chief told Petitioner that he could expect "life imprisonment" for spying. He also threatened Petitioner by noting that Petitioner's son was approaching military age and could be drafted and deployed to a dangerous conflict zone. The investigative chief told Petitioner that he was in trouble because he was "trying to dishonor the military police, and things like [that] cannot be allowed"; the police would "deal with the reporter separately." Petitioner was released the next day, after his wife and cousin paid a $3,000 bribe and promised that Petitioner would leave Armenia.

The IJ held that Petitioner was ineligible for asylum and withholding of removal because he had failed to establish that

he was persecuted on account of political opinion. The IJ concluded that Petitioner's conversation with the reporter did not amount to whistleblowing because Petitioner

> was telling about one incident with one police chief, not about the whole police force. It was not an act of corruption within the police department. . . .
>
> . . . [Petitioner] was not complaining about any bribes, he was not complaining about any money that the police chief took, he was not complaining that the police chief tried to not pay for his service, he was simply stating to the reporter that the police chief had him beaten up because he did not like what appeared to be an insult to him.
>
> . . . .
>
> . . . I do not find that what [Petitioner] was stating would show corruption. And in order to be whistle blowing you have to show corruption.

The IJ also concluded that the harm that Petitioner suffered did not rise to the level of torture.

On appeal, the BIA held that Petitioner was ineligible for asylum or withholding of removal because he had not demonstrated a nexus between his actual political opinion and the harm that he experienced. In so holding, the BIA wrote that, "[t]o the extent that [Petitioner] sought to publicize his mistreatment, he has not demonstrated that his actions were

meant to expose corruption in a governing institution, in this case the military police." The BIA contrasted the facts in Petitioner's case to the facts in *Baghdasaryan v. Holder*, 592 F.3d 1018 (9th Cir. 2010):

> Unlike the [petitioner] in *Baghdasaryan*, [*id.*] at 1024, who engaged in a persistent and very public campaign against a widespread protection racket, the actions of [Petitioner] in this case were limited to answering a reporter's questions about an aberrational abuse of power committed by a single law enforcement official.

The BIA adopted the portion of the IJ's opinion finding that the initial altercation and subsequent retaliation were "purely personal" and not examples of corruption. Because it found that Petitioner had failed to establish a nexus between persecution and "his imputed political opinion," the BIA held that Petitioner was ineligible for asylum or withholding of removal without reaching the question whether the harm that Petitioner suffered constituted persecution. Finally, the BIA held that Petitioner was ineligible for CAT relief because he had not been tortured.

Petitioners timely petition for review.

## STANDARD OF REVIEW

Our review is "limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Popova v. INS*, 273 F.3d 1251, 1257 (9th Cir. 2001) (internal quotation marks omitted). We review de novo the BIA's legal determinations and for substantial evidence the BIA's factual

determinations. *Id.* We will remand if the BIA rested its conclusion on "erroneous legal premises." *Grava v. INS*, 205 F.3d 1177, 1182 (9th Cir. 2000). We also will remand if the BIA did not reach an essential issue. *Orlando Ventura*, 537 U.S. at 17–18.

## DISCUSSION

To establish eligibility for asylum, a petitioner must prove that he or she is "unable or unwilling" to return to his or her country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a political social group, or political opinion." 8 U.S.C. §§ 1158(b)(1)(B)(i), 1101(a)(42)(A). A petitioner must show that there is a "nexus between [the] mistreatment and a protected ground." *Baghdasaryan*, 592 F.3d at 1023. If the protected ground is political opinion, the petitioner must demonstrate that he or she (1) "had either an affirmative or imputed political opinion," and (2) was "targeted *on account of* that opinion." *Sagaydak v. Gonzales*, 405 F.3d 1035, 1042 (9th Cir. 2005). Under the provisions of the REAL ID Act, which apply here, the protected characteristic must be "at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i).

The facts in this case require us to connect two long-established lines of precedent concerning political opinion as a protected ground. In the first line of cases, we have repeatedly recognized that official retaliation against a whistleblower may amount to persecution on account of political opinion. *See Baghdasaryan*, 592 F.3d at 1024 (listing whistleblowing cases). In determining whether the whistleblowing constitutes protected political opinion, the "salient question" is whether the individual's actions are

"directed toward a governing institution, or only against individuals whose corruption was aberrational." *Grava*, 205 F.3d at 1181.

In the second line of cases, we have made clear that "an applicant may establish a political opinion for purposes of asylum relief by showing an imputed political opinion." *Kumar v. Gonzales*, 444 F.3d 1043, 1053–54 (9th Cir. 2006) (internal quotation marks omitted) (listing imputed political opinion cases ). To demonstrate that persecution is on account of an *imputed* political opinion, a petitioner need not prove that he or she *actually* held a political opinion or acted in furtherance of it, but must provide "some evidence," "direct or circumstantial," that the *persecutor* was motivated by a *belief* that the petitioner held the political opinion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (emphasis omitted).

We now apply those two lines of cases to hold that one form of imputed political opinion is perceived whistleblowing. That is, an applicant for asylum or withholding of removal may demonstrate persecution on account of a protected ground if he or she shows that the persecutor *thought* that the applicant was attempting to expose corruption in a governing institution and mistreated the applicant as a result, even if the applicant in fact had no such intention.

Substantial evidence supports the BIA's conclusion that Petitioner was not an *actual* whistleblower. But the BIA's analysis was incomplete, because it failed to address whether Petitioner was harmed on account of an *imputed* political opinion. The BIA should have considered whether Petitioner had shown that the military police *believed* that he was a

whistleblower and mistreated him as a result of that belief. More specifically, the question is whether the military police believed that Petitioner's conversation with the reporter was "directed toward a governing institution," as distinct from being directed only toward the police chief's "aberrational" conduct. *Grava*, 205 F.3d at 1181.

In *Singh v. Holder*, 764 F.3d 1153 (9th Cir. 2014), we addressed what type of evidence can demonstrate that a persecutor imputed a political opinion to an applicant. Testimony regarding a persecutor's statements about motive is direct evidence that the applicant's political opinion motivated the persecution. *Id.* at 1159. In *Singh*, the "direct evidence" consisted of the petitioner's credible testimony that the police called him a "'traitor'" and accused him of "'working against the government.'" *Id.* A petitioner's "association with, or relationship to, people who are known to hold a particular political opinion" may serve as indirect evidence of imputed political opinion. *Id.* (internal quotation marks omitted). In *Singh*, the "indirect evidence" was that the police had interrogated the petitioner about his domestic servant, a man whom the police characterized as a "terrorist." *Id.* at 1157, 1159. We held that the direct and indirect evidence, taken together, "compel[led] the conclusion" that the petitioner was subjected to abuse because of "imputed political opinion." *Id.* at 1162.

Here, Petitioner provided direct evidence of a nexus to imputed political opinion when he testified credibly that the chief of the investigative department accused him of trying to "dishonor the military police" and accused him of espionage. Petitioner provided indirect evidence of a nexus when he introduced evidence that (1) he was picked up immediately after his meeting with the reporter; (2) the reporter was

seeking to publish a pre-election article about corruption of leading governmental officials and encouraged him to talk to her because, if stories like his did not come to light, the country would "stay in a . . . bad situation with its people"; (3) the chief of the investigative department told him that they would "deal with the reporter separately"; and (4) the reporter worked for an "opposition" newspaper.[3]

The question thus presented is whether that direct and indirect evidence is sufficient proof that (1) the military police *believed* Petitioner to be a whistleblower who was attempting to expose corruption and, if so, (2) their belief motivated them to detain, beat, and threaten Petitioner. Even though the BIA couched a portion of its holding in terms of imputed political opinion, a close look at the BIA's decision reveals that it did not address that key question at all.

First, the BIA's word choice shows that the BIA focused on Petitioner's intent rather than on the police officers' perceptions: "To the extent that [Petitioner] *sought* to publicize his mistreatment, he has not demonstrated that his actions were *meant* to expose corruption in a governing institution, in this case the military police." (emphases added). The BIA then cited *Baghdasaryan* to contrast the campaign to fight government extortion in that case with Petitioner's single substantive conversation with a reporter. Again, the BIA focused on Petitioner's intent, noting that the

---

[3] Even though we express no view on the ultimate merits of the imputed political opinion issue, we summarize the evidence of a nexus between the harm suffered and an imputed political opinion because the BIA's error would be harmless if nothing in the record could support a finding of a nexus. *See Li Hua Yuan v. Att'y Gen. of U.S.*, 642 F.3d 420, 427 (3d Cir. 2011) (surveying federal appellate decisions that applied the harmless-error standard in reviewing BIA decisions).

campaign in *Baghdasaryan* was "persistent and very public." That reasoning and that citation provide ample support for the BIA's determination that Petitioner was not an *actual* whistleblower, but they tell us nothing about whether the military police *thought* that Petitioner was a whistleblower.

Second, the BIA adopted the IJ's finding that the retaliation against Petitioner was "purely personal, as it was motivated by the official's desire to avoid the consequences of his violent reaction to [Petitioner's] perceived insult." But in reaching that conclusion, neither the BIA nor the IJ, in the parts of the opinion adopted by the BIA, addressed any of the direct or circumstantial evidence that the military police were attempting to silence Petitioner because they thought that he intended to expose government corruption.[4]

Moreover, the reasons that the IJ provided to support the conclusion that the retaliation was "purely personal" contravene our precedents. First, the IJ concluded that there was no corruption to expose because the initial confrontation at the hotel did not involve bribery or extortion. But the concept of government corruption is broader than that, and

---

[4] According to the dissent, in remanding for the BIA to consider the police chief's perception of Petitioner's conversations with the reporter, we reject Petitioner's own testimony that the conflict was purely personal. Dissent at 19. But the dissent takes Petitioner's testimony that his abduction was caused by his disrespectful response to the police chief, and "[n]othing else," out of context. There is no dispute that Petitioner's problems *began* with his response to the police chief's demands at the restaurant, so in that sense "nothing else" caused him to be beaten, jailed, and threatened. But Petitioner explained that the initial incident led to his conversations with the reporter, which in turn led the military police to detain, beat, and threaten him; according to Petitioner, much more was at play than simply the initial altercation.

efforts to expose something that begins as a personal dispute can be interpreted as political dissent. *See Yan Xia Zhu v. Mukasey*, 537 F.3d 1034, 1043–45 (9th Cir. 2008).**[5]** The IJ next concluded that a news story about Petitioner's confrontation with the police chief would put only the police chief, rather than the entire military police system, in a bad light. But the fact that the information that Petitioner could have given to the reporter concerned conduct of a single individual does not necessarily mean that it would not serve to expose more general corruption. *See Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir. 2004) (holding that the petitioner's article criticizing a single governmental official was "directed toward a governing institution" because of its

---

**[5]** The dissenting opinion's crabbed view of what constitutes "corruption," dissent at 22, is inconsistent with *Yan Xia Zhu*, in which the petitioner wrote a letter to government officials asking that they investigate her allegation that she had been raped by her factory manager. In the letter, the petitioner "also complained that 'the government officers even let this kind of a person to be an officer'" and alleged that the official was able to obtain and keep his position of authority because of family connections. *Yan Xia Zhu*, 537 F.3d at 1037. We held that the petitioner's "condemn[ation of] the appointment and protection—on the basis of family political connections—of people like the manager who raped her" constituted a revelation of corruption. *Id.* at 1044.

"Corruption" broadly refers to an abuse of public trust. *Regalado-Escobar v. Holder*, 717 F.3d 724, 729–30 (9th Cir. 2013). In common parlance, as well as in precedent, "corruption" means a lack of integrity and a use of a position of trust for dishonest gain, which need not be financial. One form of "gain" is the maintenance of a position of authority. *Yan Xia Zhu*, 537 F.3d at 1037. We remand for the BIA to consider whether the evidence shows that the police chief, in an effort to keep his government job, used his position of power to silence a possible report about his abuse of that power. We do not, as the dissent claims, seek to extend asylum protections to "anyone anywhere who suffers abuse by an arrogant bully with a government job." Dissent at 22.

references to the "systemic nature" of that official's corruption).

It is not entirely clear whether the BIA incorrectly applied the test for imputed political opinion or simply neglected to consider the question of imputed opinion at all. Either way, the BIA committed legal error. Accordingly, we grant in part the petition for review and remand to the BIA for further consideration of Petitioners' asylum and withholding of removal claims. We express no view on (a) whether one central reason for the harm that Petitioner suffered was that the military police thought that he was engaged in whistleblowing intended to expose government corruption or (b) whether Petitioner has demonstrated harm rising to the level of past persecution or has shown a well-founded fear of future persecution.[6]

---

[6] The dissenting opinion faults us for remanding to the BIA to consider an additional valid theory as to which the evidence *could* support relief. Dissent at 21. But as we have explained, the BIA either misunderstood or did not consider the imputed whistleblower theory. When the BIA fails to "'state with sufficient particularity and clarity the reasons for'" its decision, it does not "'provide an adequate basis for this court to conduct its review.'" *Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013) (quoting *Castillo v. INS*, 951 F.2d 1117, 1121 (9th Cir. 1991)). Moreover, the BIA's use of the phrase "imputed political opinion" does not change our analysis, because "[b]oilerplate opinions" that "are devoid of statements that evidence an individualized review" of the issue "must be remanded to the Board for clarification of the bases for its opinion." *Castillo*, 951 F.2d at 1121. We are not free to guess at what the BIA would have said about imputed whistleblowing. By clarifying the applicable legal standard for imputed whistleblowing and remanding that issue to the BIA, we do not find fault with any of the BIA's factual findings and do not express a view on the ultimate outcome of the remanded claim.

Petition **DENIED** in part,[7] **GRANTED** in part, and **REMANDED**.  Costs on appeal awarded to Petitioners.

---

OWENS, Circuit Judge, concurring:

I concur in Judge Graber's thoughtful opinion.  I write separately to emphasize that the United States Department of Justice's position in this and other immigration cases clashes with its own campaign against foreign corruption.

The Justice Department does not limit corruption to "bribery."  Rather, it correctly defines corruption as the "abuse of entrusted power for personal gain."  Shortly after the Arab Spring, former Assistant Attorney General Lanny Breuer recounted the tragic story of Mohammed Bouazizi, who lit himself on fire in Tunisia after suffering the abuse of a corrupt local official.

> Bouazizi faced corruption at the most personal level.  His fruit stand and electronic scale were arbitrarily taken from him by a municipal inspector, who also humiliated him

---

[7] Substantial evidence supports the BIA's conclusion that Petitioner did not show that it is more likely than not that he will be tortured if he is removed to Armenia.  The BIA permissibly ruled that the harm that Petitioner suffered does not rise to the level of treatment that we have previously recognized as torture.  *See Ahmed v. Keisler*, 504 F.3d 1183, 1201 (9th Cir. 2007).

> with a slap across the face, and authorities
> refused to give him back his property.[1]

Bouazizi's tale is unfortunately a global one, shared by Khudaverdyan and many others. A guard who demands sexual favors from a prisoner is corrupt.[2] So is a police officer who brutalizes a local community.[3] And so is a police

---

[1] Lanny A. Breuer, Assistant Att'y Gen., Address at the 26th National Conference on the Foreign Corrupt Practices Act (Nov. 8, 2011) (transcript available at http://www.justice.gov/criminal/pr/speeches/ 2011/crm-speech- 111108.html).

[2] *See, e.g.*, Office of the Inspector Gen., U.S. Dep't of Justice, The Department of Justice's Efforts to Prevent Sexual Abuse of Federal Inmates 3 (2009) (describing the investigation of "a ring of correctional officers [who] provided contraband to prisoners in return for sexual favors" and "intimidated prisoners to keep them from cooperating with investigators once the corruption was discovered"), *available at* http://www.justice.gov/oig/reports/plus/e0904.pdf; Press Release, U.S. Dep't of Justice, Attorney General Honors Medal of Valor Recipients (Oct. 22, 2008) (honoring agent for investigating "corrupt prison guards in a federal prison facility" who, among other things, "sexually abus[ed] female inmates"), *available at* http://ojp.gov/newsroom/pressreleases/ 2008/oaag09004 .htm.

[3] *See, e.g.*, Press Release, U.S. Dep't of Justice, Civilian Pleads Guilty to Conspiring with Corrupt Police Officers in July 2012 Robbery in Bayamon, Puerto Rico (Nov. 7, 2014) (announcing guilty plea of civilian who joined with "corrupt police officers" to rob a house of money and cocaine while "falsely claim[ing] they were executing a search warrant"), *available at* http://www.justice.gov/opa/pr/ civilian-pleads-guilty-conspiring-corrupt-police-officers-july-2012-robbery- bayamon-puerto; Press Release, U.S. Dep't of Justice, Five New Orleans Police Officers Sentenced on Civil Rights and Obstruction of Justice Violations in the Danziger Bridge Shooting Case (Apr. 4, 2012) (announcing sentencing of "corrupt police officers" who "shot innocent people" in the aftermath of

chief who, to impress his "ladies and friends," uses his bodyguards to beat up a restaurant manager who refuses to kowtow to his demands. None of these violations feature bribes, but all involve the abuse of entrusted power for personal gain, which can be as petty as trying to look like a big shot in front of friends and members of the opposite sex. As Judge Graber's opinion ably demonstrates, this court has acknowledged that this abuse, not the exchange of money, is the essence of corruption. And I read our immigration laws as protecting (rather than deporting) those who protest (or are perceived as protesting) corrupt government officials. It is unclear why the Justice Department champions the fight against foreign corruption while it simultaneously tries to deport those perceived as fighting foreign corruption. As Cinna the Poet learned in Julius Caesar, it matters more that the State thinks one is an enemy than being an enemy of the State. William Shakespeare, Julius Caesar act 3, sc. 3.

---

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent.

Khudaverdyan supervised the waiters at a restaurant frequented by government officials, foreign visitors and business people. One night at the restaurant, Khudaverdyan responded to a complaint by the police chief that "the food doesn't taste good" and was "served late." Rather than apologizing and giving the deferential response that the police

---

Hurricane Katrina "and then went to great lengths to cover up their own crimes"), *available at* http://www.justice.gov/opa/pr/five-new-orleans-police-officers-sentenced-civil- rights-and-obstruction-justice-violations.

chief may have expected, Khudaverdyan said that "our food is good . . . [it] requires a long time [to prepare] and . . . we have other guests." Khudaverdyan says that his response "humiliated" the police chief because he was with "ladies and friends." Khudaverdyan's own testimony is that because of his response, the chief's two bodyguards took him outside and beat him up. A week after the restaurant beating, a reporter approached Khudaverdyan for information about the incident. He agreed to meet with her, but ultimately decided not to tell her anything. Later that day, he was picked up by the police, held overnight, and accused of espionage the following morning. He was beaten and threatened with life in prison and with the conscription of his son into the military for "dishonoring the military police." The next morning he was released when his wife and cousin gave the police a $3,000 bribe.

Thus, Khudaverdyan's account of the facts supports the inference that his mistreatment was not attributed to an imputed political opinion. Substantial evidence on the record supports the BIA's decision crediting Khudaverdyan's opinion about why he was abused. Khudaverdyan testified that his mistreatment at the hands of the police was due to disrespect, not politics. "Q: [] [Y]ou believe that you had been abducted all because of insulting the chief of police? A: Yes. Nothing else." Khudaverdyan's own testimony supports the BIA's decision, not the majority's, because "nothing else" brought about his travails but "insulting" the police chief.

The BIA agreed with the IJ that Khudaverdyan "did not establish that his past harm and feared future harm were on

account of an imputed political opinion."[1]  The BIA expressly noted that "official retaliation against those who expose governmental corruption may amount to persecution on account of political opinion," but found that Khudaverdyan did not demonstrate that his actions were so intended or understood.  The BIA found that the abuse Khudaverdyan suffered was personal, flowing from the police chief's "violent reaction to the respondent's perceived insult."[2]

I am baffled as to why the majority thinks that the BIA doesn't understand the doctrine of imputed political opinion and its extension to whistleblowing.  The BIA considered these claims and found them to be without merit. The law that should control this case is the standard of review.  "The BIA's determination . . . must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole.  It can be reversed only if the evidence presented [] was such that a reasonable factfinder would *have to* conclude that the requisite fear of persecution existed."[3]  This burden of proof is on the petitioner.  We do not have authority to overturn a BIA decision supported by substantial evidence, as this one was, even though an argument can be made that the evidence could have been interpreted in a different way to support relief.  "'In order to reverse the BIA, we must determine that the evidence not only *supports* [a contrary] conclusion, but *compels* it' and also compels the further conclusion that the petitioner meets the requisite

---

[1] Decision of the Board of Immigration Appeals, September 30, 2010.

[2] *Id.*

[3] *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal citation omitted) (emphasis added).

standard for obtaining relief."[4]   Sometimes this deferential standard of review is troubling, but not here.  The majority says that the BIA overlooked a legal doctrine, "imputed whistleblowing" that *could* support relief.[5]  The BIA did not overlook anything.  We are required by law to deny the petition if there is substantial evidence for its determination.  There was.

Evidently, the majority thinks that Khudaverdyan was wrong about why he was beaten and jailed, and that the BIA is ignorant of the law.  I cannot see how the evidence would compel that view or even support it.   The BIA could reasonably interpret the accusation of  "dishonoring" the military police to mean talking back instead of showing respect.   The police chief obviously disliked being embarrassed in front of his friends by a waiter.   Had Khudaverdyan told this story to the reporter, it would likely have further embarrassed the police chief.   Our anti-corruption political opinion cases bear little resemblance to Khudaverdyan's.  For instance, in *Hasan v. Ashcroft*,[6] an Armenian woman wrote a newspaper article exposing corruption of a high government official.  In *Grava v. I.N.S.*,[7] a Filipino man reported several instances of smuggling by corrupt customs officers.   In *Badhdasaryan v. Holder*,[8] a

---

[4] *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2014) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n. l (1992)).

[5] Maj. Op. at 15, n.6.

[6] 380 F.3d 1114 (9th Cir. 2004).

[7] 205 F.3d 1177 (9th Cir. 2000).

[8] 592 F.3d 1018 (9th Cir. 2010).

business owner organized a rally with 100 other business owners to protest bribes they had to pay to corrupt government officials to stay in business, and in *Fedunyak v. Gonzales*,**[9]** a car dealer refused to pay a bribe to corrupt local government officials and reported the conduct to the local police, the mayor, and his congressman. The majority evidently seeks to expand the category of asylum for persecution on account of political opinion to anyone anywhere who suffers abuse by an arrogant bully with a government job. Maybe there is someplace on earth free from such bullies, but I doubt it.

Judge Owens provides a good definition of corruption, "abuse of entrusted power for personal gain." But, if the "personal gain" includes the feeling of vindication a person with political power gets from hurting someone insufficiently obsequious, as in this case, then the definition is too inclusive to be useful. Khudaverdyan was abused by a bullying police chief because he talked back, not because of whatever political opinions he had or that might have been imputed to him. Ironically, the only corrupt conduct squarely under Judge Owens's definition was Khudaverdyan's cousin who "had connections" showing up at the jail with a $3,000 bribe. The police took the money and let Khudaverdyan go. Nothing in the record showed that the police requested a bribe, but fortunately for Khudaverdyan, police greed trumped police arrogance.

If Congress chooses to extend asylum to all who have been abused by arrogant government employees, it can. But so far, it has offered it only to those who flee their countries, "because of persecution or a well-founded fear of persecution

---

**[9]** 477 F.3d 1126 (9th Cir. 2007).

on account of race, religion, nationality, membership in a particular social group, or political opinion."[10]  Substantial evidence supported the BIA's conclusion that Khudaverdyan did not bear his burden of proof that he fell within this classification.

---

[10] 8 U.S.C. § 1101(a)(42)(A).