**Kugarajah RATNAM, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 97–70000.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1998.

Decided Aug. 31, 1998.

Judith L. Wood, Jesse A. Moorman, Los Angeles, California, for the petitioner.

Margaret L. Perry, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for the respondent.

Before: FLETCHER, D.W. NELSON and SILVERMAN, Circuit Judges.

FLETCHER, Circuit Judge:

Kugarajah Ratnam, a 28–year old native and citizen of Sri Lanka, petitions for review of the BIA's affirmance of the IJ's order of exclusion and deportation. Ratnam claims that the BIA erred in holding that the presumption of political motivation arising from his torture by the Sri Lankan government was rebutted by evidence that the government's purpose was to gather intelligence regarding terrorist activity. We grant the petition and remand so that the BIA may grant withholding of deportation and exercise its discretion whether to grant asylum.

## I.

Kugarajah Ratnam was detained by the INS in San Francisco, California, on March 11, 1995, and charged with excludability on the grounds that he attempted to enter the United States without a valid immigrant visa, that he sought to procure entry by wilfully misrepresenting a material fact and that he was likely to become a public charge. In a hearing before an Immigration Judge, Ratnam conceded excludability, but applied for asylum and withholding of deportation based on fear of future persecution on account of an imputed political opinion. Ratnam fears persecution if returned to Sri Lanka due to the government's previous imprisonment and torture of him under the mistaken belief that he was a member of the Liberation Tigers of Tamil Eelam ("Tigers" or "LTTE").

Ratnam testified before the IJ that he was a fisherman in Sri Lanka with his own fishing boat. Ratnam, an ethnic Tamil, lived with his wife and two children in the Jaffna district of Sri Lanka, a stronghold of the LTTE. Ongoing conflict with the Sinhalese majority Sri Lankan government in the area is endemic.

Ratnam further testified that, despite his Hindu belief in nonviolence, he was forced throughout his adult life to pay a "war tax" to the LTTE under the threat of death. Those who refused support to the Tigers were killed and signs were hung around the necks of the corpses stating "because this person informed against us to the Army, this is the punishment we have given him."

In March 1994, two men dressed in the uniform of the LTTE came to Ratnam's house and ordered him to help them transport their cargo in his fishing boat. Ratnam initially told them that, although he supported the Tigers financially, he did not want to participate in their violent struggle. Nevertheless, Ratnam was made to cooperate, and on 25 to 30 occasions he transported their goods in his boat. Ratnam was forced to do so at gunpoint believing that refusal to cooperate would result not only in his death but that of his family as well.

On January 16, 1995, the LTTE again ordered Ratnam to transport their cargo, eight to ten sacks of weapons, to the island of Mandaithivu. Two Tigers accompanied him on this mission. While at sea, they were chased and ultimately captured by the Sri Lankan navy. The Tigers committed suicide by taking cyanide capsules to avoid capture by the navy.

The navy confiscated Ratnam's boat and took him to a nearby base where he was detained for two days. On the first evening, Ratnam was beaten and asked repeatedly why he did not swallow a cyanide capsule like the other Tigers. Ratnam told the navy officers that he was not a Tiger, but a fisherman with a family to support. Ratnam was thrown against a wall, where he hit his head and lost consciousness. When he awoke the next morning, Ratnam was forced to sign a document, which he suspected to be a confession, but which he could not read because it was written in Sinhalese.

The following day, Ratnam was transported to the capital city of Colombo and then to the Wellikade Army Camp. Ratnam was held there for 25 days, during which time he was interrogated, kicked and beaten with batons, gun butts and plastic pipes filled with sand. Ratnam was also tipped upside down and his head immersed in a drum of water. His interrogators repeatedly demanded that he admit to being a Tiger, demanded the whereabouts or location of the Tigers, asked him to become an informer against any Tigers in his family, and threatened him with "problems" if he did not agree.

Ratnam was finally released when his uncle bribed one of the Sinhalese officials. Ratnam then fled Sri Lanka, arriving in San Francisco on March 11, 1995. Ratnam testified that he fears that the Sri Lankan military would consider him an escaped LTTE terrorist because the officer who took the bribe for his release reported that Ratnam had escaped. Ratnam also testified that he fears arrest, torture and death by the military should he be returned to Sri Lanka.

In opposition to Ratnam's application for withholding of deportation and asylum, the INS submitted the State Department "Country Report on Human Rights Practices for 1994" for Sri Lanka. The report acknowledged the ongoing conflict between the LTTE and the government and stated, *inter alia*, that, although Sri Lanka had recently acceded to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, government security forces continued to torture and mistreat detainees with beatings, near drownings and forced positions.

Following the evidentiary hearing, the IJ denied Ratnam's application for relief from exclusion on the grounds that he had "not shown that a reasonable person in his position would have a well-founded fear of persecution from Government authorities or any other group." The IJ found Ratnam to be "not a totally credible witness," specifically with regard to his claims that he did not participate knowingly or voluntarily in the Tiger gun-running, and that he had no knowledge of the location of the LTTE camps. The IJ concluded that Ratnam had not shown persecution by the government on account of any political opinion.

A divided panel of the BIA affirmed the decision of the IJ. The majority noted the IJ's concerns regarding Ratnam's credibility on certain subjects, but determined that "[t]here is no indication that the Immigration Judge disbelieved the material facts relating to his persecution claim by the Sri Lankan authorities which are relevant to our legal determination now." Accordingly, the Board deemed Ratnam "a credible witness" with respect to the matters material to his appeal. Nevertheless, the majority held that Ratnam had failed to establish that he was a victim of past persecution on account of an imputed political opinion.

One BIA Member dissented, citing *Harpinder Singh v. Ilchert,* 63 F.3d 1501 (9th Cir.1995), which held that, where no charges were filed against the petitioner, the torture inflicted upon him as a civilian deemed to be a political opponent during a civil war must be presumed to be on account of his imputed political opinion.

Ratnam's petition for review was timely filed. We have original jurisdiction pursuant to 8 U.S.C. § 1105a(a) to review a final order of deportation.[1]

## II.

Ratnam argues that persecution on account of an imputed political opinion is a proper basis for asylum or withholding of deportation, that a possible mixed motive on the part of the government does not impair his claim, and that nothing in the record rebutted the presumption of persecution on account of an imputed political opinion arising from the lack of any actual, legitimate criminal prosecution against him. We agree.

█ As a preliminary matter, we hold that the BIA did not err in determining that the IJ did not disbelieve the material facts testified to by Ratnam regarding his persecution claim and that he should be considered a credible witness. *See Lopez–Reyes v. INS,* 79 F.3d 908, 911 (9th Cir.1996) (explaining that we review a credibility determination by the BIA for substantial evidence and will uphold the determination unless the evidence

---

**1.** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") repeals 8 U.S.C. § 1105a and replaces it with a new judicial review provision to be codified at 8 U.S.C. § 1252. *See* IIRIRA § 306(c)(1), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* Act of Oct. 11, 1996, Pub.L. No. 104– 302, 110 Stat. 3656. However, because the new review provision does not apply to petitioners whose deportation proceedings commenced before April 1, 1997, this court continues to have jurisdiction under 8 U.S.C. § 1105a. *See* IIRIRA § 309(c)(1).

presented compels a reasonable factfinder to reach a contrary result).

■■■ An otherwise excludable alien claiming past persecution or fear of future persecution has two main avenues of relief: asylum and withholding of deportation. Pursuant to 8 U.S.C. § 1158(b), the Attorney General may in her discretion grant asylum to an alien present in the United States who is a "refugee," defined as an alien who is unable or unwilling to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Refugee status may derive from persecution on account of a political opinion imputed to the alien by the persecutor. *See Sangha v. INS,* 103 F.3d 1482, 1489 (9th Cir.1997). Moreover, while a persecutor may well be moved by multiple motives against an alien claiming refugee status, it is sufficient that one of the motives be "on account of" one of the protected categories. *See Rodriguez–Roman v. INS,* 98 F.3d 416, 430 n. 23 (9th Cir.1996).

■■■ Establishing a well-founded fear of persecution sufficient to qualify for asylum requires a "subjectively genuine" and "objectively reasonable" fear of persecution, *Arriaga–Barrientos v. INS,* 937 F.2d 411, 413 (9th Cir.1991), but does not require proof that persecution is more likely than not, *INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.").

■■■ Either past persecution or a well-founded fear of future persecution provides eligibility for a discretionary grant of asylum. An alien who establishes past persecution is presumed to have a well-founded fear of persecution. 8 C.F.R. 208.13(b)(1)(i). Moreover, a petitioner who has suffered severe past persecution is eligible for asylum "even if there is little likelihood of future persecution." *See Matter of Chen,* 20 I. & N. Dec. 16, 19 (BIA 1989).

■■■ The Attorney General must withhold deportation if an alien's "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). To obtain such a withholding of deportation, the applicant must demonstrate a "clear probability of persecution" by the government or a group that the government cannot or will not control. *Mendoza Perez v. INS,* 902 F.2d 760, 761 (9th Cir.1990). "Thus, for petitioner to succeed under § 1253(h), he must demonstrate more than a well-founded fear of persecution: he must establish by compelling proof that, viewed objectively, he is more likely than not to be persecuted because of his own political beliefs." *Gomez–Saballos v. INS,* 79 F.3d 912, 914 (9th Cir.1996).

■■■ We will uphold the BIA's denial of relief from exclusion if it is supported by reasonable, substantial and probative evidence in the record. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Astrero v. INS,* 104 F.3d 264, 265 (9th Cir.1996). Review is limited to the administrative record. *Aruta v. INS,* 80 F.3d 1389, 1393 (9th Cir.1996). However, we consider the record as a whole, including evidence which contradicts the BIA's findings. *Turcios v. INS,* 821 F.2d 1396, 1398 (9th Cir.1987). We review de novo the BIA's determinations of purely legal questions regarding the requirements of the Immigration and Nationality Act. *Fisher v. INS,* 79 F.3d 955, 961 (9th Cir.1996) (en banc).

■■■ In denying relief in the present case, the BIA majority opinion attempted to distinguish *Harpinder Singh v. Ilchert,* 63 F.3d 1501 (9th Cir.1995), a case with facts remarkably similar to Ratnam's. In *Harpinder Singh,* a Sikh citizen of India petitioned for a writ of habeas corpus after the BIA deemed him excludable and denied his application for asylum and withholding of deportation. 63 F.3d at 1503. While Singh was not a member of any political party, he supported the movement for formation of an independent Sikh state through peaceful means. *Id.* Armed Sikh militants visited Singh's home one night demanding food and shelter. *Id.* Although Singh did not accede to their requests that he join their movement, the Bhin-

drawal Tiger Force, they returned to his home on several occasions. *Id.* at 1504.

Three weeks after the militants first visited Singh, the Indian police staged an early morning raid on Singh's home without a warrant while he and his family slept. *Id.* Singh was detained without charge and beaten for five days by the police, who demanded information about the Sikh militants. *Id.* The police interrogated Singh as to when the militants visited him, what they did, and where they went upon their departure. *Id.* Singh refused to give the police any information. *Id.* Singh was released after his family paid a bribe to the police inspector. *Id.*

Three months after being released, Singh was again arrested without a warrant by the police, detained and beaten, and held without charge for eight days. *Id.* Singh still refused to give any information regarding the Sikh militants to the police, fearing for the safety of his family. *Id.* Singh was again released after paying another bribe to the police inspector, and ultimately fled to the United States. *Id.* at 1504–05. The BIA denied relief to Singh on the grounds that the Indian "security forces' activities were part of a legitimate inquiry into terrorist activities and thus ... not politically motivated within the meaning of the immigration laws." *Id.* at 1508.

We disagreed and affirmed the district court's granting of the writ. *Id.* at 1512. In doing so, we underscored the distinction "between legitimate criminal prosecution and governmental *persecution* based on [petitioner's] perceived political beliefs." *Id.* at 1508 (emphasis and alteration in original, citation and internal quotation marks omitted).

We began by noting that the record indicated "the Indian authorities' extensive abuse of vague anti-terrorism laws to suppress political dissent and stamp out secessionist ideologies in India." *Id.* Noting, too, that "Singh was not the target of any legitimate government prosecution," we emphasized that "[i]f there is no evidence of a legitimate prosecutorial purpose for a government's harassment of a person ... there arises a presumption that the motive for harassment is political." *Id.* at 1509 (ellipsis in original, citations and internal quotation marks omit-

ted). Finally, we stated that the BIA, in denying relief to Singh, "failed to recognize that persecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied." *Id.*

Based upon this analysis, we remanded to the district court for entry of a judgment granting Singh withholding of deportation and directing the BIA to exercise its discretion as to whether Singh should be granted asylum. *Id.* at 1512.

In the present case, the BIA majority opinion found that no criminal proceedings had been instituted against Ratnam, but ruled, notwithstanding *Harpinder Singh,* that the presumption that Ratnam's mistreatment was on account of an imputed political opinion had been rebutted, concluding that "[t]o the extent that the authorities' actions were based on a mixture of motives, we do not find that imputed political opinion or any other protected motivation ground reasonably played a causal role in their actions." This was error.

The BIA majority based its decision on four observations: 1) that Ratnam's arrest appeared to have a non-political cause (i.e., he was transporting weapons to an LTTE camp); 2) that Sri Lankan authorities regularly "bypassed many of the rights guaranteed under ordinary law" in order to combat the LTTE insurgency; 3) that the extent of Ratnam's detention and torture was consistent with the legitimate goals of intelligence gathering; and 4) that Sri Lankan authorities had reason to believe that Ratnam was withholding information.

However, each of the four factors relied upon by the majority to rebut the presumption of politically motivated persecution in Ratnam's case were present in equal or greater measure in *Harpinder Singh.* Singh, like Ratnam, was arrested for aiding terrorists, the Indian government routinely abused criminal protections in the service of combatting terrorism, the stated rationale behind the extended detention was intelligence gathering, and the Indian authorities had reason to believe that Singh had information about the terrorists. *See* 63 F.3d at

1504–05, 1508–09. Thus, the BIA's rationale does not adequately distinguish *Harpinder Singh.*

The INS additionally attempts to distinguish *Harpinder Singh* on two other grounds. First, the INS suggests that *Harpinder Singh* was substantially overruled by the Supreme Court in *INS v. Elias–Zacarias,* 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). However, *Harpinder Singh* was decided in 1995, three years after *Elias–Zacarias.*

Next the INS cites the State Department Country Report to contend that, unlike *Harpinder Singh,* Ratnam was captured while actually engaged in terrorist activity and that the Sri Lankan government only "rarely" uses its anti-terrorist laws. However, the actions of Harpinder Singh in harboring the guerrillas in his home would constitute "terrorist" activity under the U.S. immigration laws. *See* 8 U.S.C. § 1182(a)(3)(B)(iii)(III). Moreover, the State Department Country Report cited by the INS states that "torture remains a serious abuse and is practiced by both government and LTTE forces."

Finally, the INS attempts to distinguish *Matter of SP–,* Interim Decision (BIA) 3287 (1996), in which the BIA granted asylum to a Tamil civilian who was tortured by the Sri Lankan military after being captured in an LTTE bunker. The INS argues that, unlike *Matter of SP–,* in Ratnam's case there was "legitimate intelligence gathering underlying the beatings."

 This argument, however, fails to recognize that "persecutory conduct may have more than one motive, and so long as one motive is one of the statutory grounds, the requirements have been satisfied." *Harpinder Singh,* 63 F.3d at 1509. Torture in the absence of any legitimate criminal prosecution, conducted at least in part on account of political opinion, provides a proper basis for asylum and withholding of deportation even if the torture served intelligence gathering purposes.

## III.

This case is squarely controlled by *Harpinder Singh.* We reject the argument that extra-prosecutorial torture, if conducted for intelligence gathering purposes, does not constitute persecution. Since the torture in this case was at least in part on account of Ratnam's imputed political opinion, he is entitled to relief from exclusion and deportation.

The petition is GRANTED and the matter REMANDED so that the BIA may grant withholding of deportation and exercise its discretion whether to grant asylum.