NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

─────────────

No. 15-1374

─────────────

MOHAMED RAMEEZ RAFEELDEEN,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA,

Respondent

─────────────

On Petition for Review of a Final Order
of the Board of Immigration Appeals
Immigration Judge:  Honorable Michael W. Straus
(No. A087-435-770)

─────────────

Submitted Under Third Circuit LAR 34.1(a)
November 16, 2015

Before: AMBRO, HARDIMAN, and SLOVITER, Circuit Judges

(Opinion filed: March 7, 2016)

─────────────

OPINION*

─────────────

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

AMBRO, Circuit Judge

Mohamed Rafeeldeen petitions for review of a final order of the Board of Immigration Appeals ("BIA") approving his removal from the United States. We grant Rafeeldeen's petition in part and remand the case to the BIA.[1]

## I. Background

Because the decisions of the Immigration Judge and the BIA are silent on the issue of credibility, "we accept [Rafeeldeen's] recitation of the facts as given in his affidavits and testimony." *Lukwago v. Ashcroft*, 329 F.3d 157, 164 (3d Cir. 2003). Rafeeldeen, a Tamil-speaking Muslim, was repeatedly detained and beaten by Sri Lankan officials based on his supposed affiliation with a spy for the Liberation Tigers of Tamil Eelam ("LTTE"). Rafeeldeen's troubles began in 2002, when he was giving a tour to a group that included a Tamil man named Jeevakumar (spelled in parts of the record as Jeeva Kumar). Sri Lankan officials detained the whole group, but they released Rafeeldeen soon afterward. However, authorities shortly thereafter requested that he report to a police station, where they interrogated him about his supposed connection to Jeevakumar (about whom Rafeeldeen said he had no knowledge). Sri Lankan officials apparently believed that Jeevakumar, no longer in custody, was a spy for the LTTE, against whom the government was waging a lengthy civil war. They kicked Rafeeldeen, took off his clothes, taped his mouth, and hit him with belts until he fainted. His father secured his

---

[1] Because the Immigration Judge and the BIA both provided reasoned decisions, we review both of them. *Hashmi v. Attorney Gen.*, 531 F.3d 256, 259 (3d Cir. 2008). Our review is to determine whether substantial evidence supports their outcome. *Dia v. Ashcroft*, 353 F.3d 228, 247 (3d Cir. 2003) (en banc).

2

release, but Rafeeldeen was told to report for questioning every week until Jeevakumar was apprehended. Rafeeldeen fled to Dubai, where he remained (with the exception of a one-month trip to Sri Lanka) until 2007.

Upon Rafeeldeen's return to Sri Lanka in 2007, Sri Lankan officials arrested him and questioned him again about Jeevakumar. They broke his finger while interrogating him, causing him again to faint, and only released him on the condition that he report weekly for questioning. Shortly afterward, he left for the United States on a temporary visa, which he overstayed (giving rise to these proceedings). After he left, Sri Lankan officials twice came looking for Rafeeldeen and, when they could not find him, beat his father. They said they would kill Rafeeldeen if they located him.

## II. Past Persecution Based on an Imputed Political Opinion

Rafeeldeen argues that his past treatment by Sri Lankan officials constituted persecution based on an imputed political opinion. He bears the burden on this claim. *(Kulvier) Singh v. Gonzales*, 406 F.3d 191, 195 (3d Cir. 2005). However, he need not prove that the persecution "occurred *solely* on account" of such an imputation. *Id.* at 197 (emphasis in original). Rather, under the REAL ID Act, Pub. L. No. 109-13, Div. B, 119 Stat. 231, 302 (2005), showing that an imputation was "at least one central reason" will suffice. *Ndayshimiye v. Attorney Gen.*, 557 F.3d 124, 127 (3d Cir. 2009) (internal quotation marks omitted). Under this test, the imputation cannot be "incidental, tangential, or superficial" as a motive. *Id.* at 130 (internal quotation marks omitted). At the same time, however, a "persecutor may have more than one central motivation for his

3

or her actions; whether one of those central reasons is more or less important than another is irrelevant." *Id.* at 129.

The Government argues that the motive for Rafeeldeen's treatment was a legitimate law enforcement activity (the search for a spy) rather than an imputed political opinion. But the two are not mutually exclusive, and Rafeeldeen does not need to establish that the latter predominated over the former. He merely must show that an imputed political opinion was at least a principal reason for his treatment. And he has done so. Specifically, he testified that Sri Lankan authorities called him a "Tiger supporter." Certified Administrative Record ("CAR") 103. He also said they labeled him a "traitor" and "curse[d]" him because he is a Tamil-speaking Muslim who "helped the LTTE." *Id.* at 106, 108. Asked if authorities suspected him of "being part of the LTTE, even a spy," he answered "yes." *Id.* at 119. Rafeeldeen testified that these beliefs were inaccurate and that he has never been associated with the LTTE. *Id.* at 118.

In *(Kulvier) Singh*, the police also had a legitimate law enforcement motivation, which was the search for illegal weapons. But we held that the statements of certain officers demonstrated that the persecution was "motivated in significant part by the police's desire to punish [the applicant] and his father for the father's political activities regardless of any legitimate law enforcement purpose the police may have had in investigating [the applicant's] father for harboring illegal weapons." 406 F.3d at 198. On the record before us, the same motivation appears here.

In addition to the statements authorities made to Rafeeldeen, his re-detention in 2007 is also relevant. Parts of his 2002 detention can be chalked up to legitimate law

4

enforcement motives. He had just encountered an alleged spy, and the government's questioning of him based on that might not, by itself, be a basis for finding an imputation of a political opinion. But the government re-detained Rafeeldeen in 2007, beat him, never charged him with a crime, and only released him on the condition that he report weekly for questioning. And after he left for the United States, authorities continued to look for him and in their efforts beat his father. This shows that the government did not accept Rafeeldeen's explanation in 2002 that he was just a tour guide in the wrong place at the wrong time. (If there were evidence that Rafeeldeen was actually involved with the LTTE, this would be a different case.)

Our conclusion is consistent with how other courts and the BIA have treated similar facts involving the LTTE. *See, e.g.*, *Ratnam v. INS*, 154 F.3d 990, 992, 996 (9th Cir. 1998) (applicant arrested while performing forced mission for the LTTE established persecution based on an imputed political opinion where Sri Lankan officials beat and interrogated him under the "mistaken belief that he was a member of the [LTTE]"); *In re S-P-*, 21 I. & N. Dec. 486, 495–96 (BIA 1996) (same for applicant found at LTTE base camp where he had been forced to work).[2]

The most analogous case, however, arose outside the LTTE context. In *(Kamalpal) Singh v. Holder*, 764 F.3d 1153 (9th Cir. 2014), the authorities believed that the applicant (Singh) had employed a domestic servant (Khan) who was a Kashmiri

---

[2] Although *(Kulvier) Singh*, *Ratnam*, and *In re S-P-* came out prior to the current requirement, stemming from the REAL ID Act, that a protected ground be at "at least one central reason" for persecution, we have no reason to believe that their outcomes would be different under the current standard.

terrorist. Based solely on Singh's connection to the servant, authorities arrested him, beat him, and labeled him a "'traitor'"—the same descriptor applied to Rafeeldeen—"who was 'working against the government.'" *Id.* at 1157. Like Rafeeldeen, Singh testified that he was not associated with terrorists and that he did not have any information about the suspected terrorist. *Id.* at 1160. As with Rafeeldeen, there were no adverse credibility findings. *Id.* at 1161. The Ninth Circuit, applying the REAL ID Act's centrality test, concluded that the denial of asylum on the basis of an imputed political opinion was not supported by substantial evidence. In particular, the Court reasoned that, "[t]aking Singh's testimony as true, as we must, Singh was falsely accused of being a terrorist and holding antigovernment views because of his association with Khan." *Id.* at 1160. *See also id.* (noting that Congress, in enacting the REAL ID Act, "explicitly reiterated that an applicant sufficiently shows a nexus to a protected ground when he provides evidence that law enforcement mistakenly believes him to be a terrorist.").

In (*Kamalpal*) *Singh*, as in our case, the authorities' questioning was single-mindedly focused on eliciting information about a supposed terrorist. The dissent there, like the dissent here, seized on this and argued that the questioning, while abusive, was merely "taking [the authorities' view] to its logical extension—that [the applicant] would have useful information about that terrorist." *Id.* at 1167 (George, J., dissenting in part and concurring in part). The majority rejected this argument. *Id.* at 1162 n.7 ("To the extent that the dissent makes the extraordinary claim that the police could not have imputed a political opinion to Singh because they interrogated him for information about Khan, such a claim is flatly at odds with our precedent.").

6

We agree with the Ninth Circuit's analysis in *(Kamalpal) Singh*. Contrary to our dissenting colleague's view, it is not *what* the Sri Lankan authorities asked Rafeeldeen about (Jeevakumar), but *why* they were asking the questions (because they mistakenly believed Rafeeldeen was an LTTE supporter) that determines our outcome. As evidenced by statements made to Rafeeldeen during questioning and by the very fact of his re-detention in 2007, Sri Lankan authorities did not accept as true that which we, as a result of the lack of adverse credibility findings, must: that Rafeeldeen had no connection to the LTTE. The authorities' contrary belief, even if formed in the context of a law enforcement investigation, is the basis for an imputation. Although our dissenting colleague is correct that our review is deferential, we conclude—as we did in *(Kulvier) Singh* and the Ninth Circuit did in *(Kamalpal) Singh*—that substantial evidence does not support the determination that Rafeeldeen failed to establish this imputation.

### III. The Government Has Not Carried Its Burden

Because Rafeeldeen has met his burden to show past persecution based on an imputed political opinion, he has triggered a "rebuttable presumption" of eligibility for asylum based on a well-founded fear of future persecution. *(Kulvier) Singh*, 406 F.3d at 195–96 (internal quotation marks omitted). It is the Government's burden to rebut the presumption by a preponderance of the evidence. *Toure v. Attorney Gen.*, 443 F.3d 310, 317 (3d Cir. 2006).

The Government tried to meet its burden in three ways. First, it relied heavily on the fact that the civil war in Sri Lanka ended with the defeat of the LTTE in 2009. However, as a State Department report in the administrative record demonstrates,

7

conditions are still dangerous despite the end of that war. *See* CAR 132 (noting that among the "major human rights problems" in Sri Lanka are attacks against persons viewed as LTTE "sympathizers" and that there is "widespread impunity" for "police torture"). The end of the civil war might be enough if the burden were on Rafeeldeen. But it is not enough for the Government to carry its burden.

Next, the Government notes that Sri Lankan officials have not looked for Rafeeldeen since 2007 and argues that this is an indication that they are no longer interested in him. This ignores Rafeeldeen's allegation that government officials re-detained him in 2007 when he returned from Dubai. That is five years after officials initially detained him in 2002. There is no indication that government officials were persistently looking for him while he was in Dubai, but his return to Sri Lanka, even after several years, reignited their interest. It is plausible that the same thing could happen again. Finally, our Government notes that we do not know what happened to Jeevakumar or whether the authorities are still looking for him. In light of Rafeeldeen's claim that he knows nothing about Jeevakumar, it would be incongruous to require Rafeeldeen to produce that evidence when the burden is on the Government.

\*    \*    \*    \*    \*

In this context, we grant Rafeeldeen's petition in part and remand the case to the BIA for further proceedings consistent with this opinion. *See Fei Mei Cheng v. Attorney Gen.*, 623 F.3d 175, 197 (3d Cir. 2010) (noting that remand rather than reversal is

8

appropriate because the "ultimate decision concerning . . . eligibility for asylum is the agency's, not ours, to make").[3]

---

[3] Rafeeldeen also requests 1) asylum on the theory of persecution for membership in a social group; 2) withholding of removal; and 3) relief under the Convention Against Torture ("CAT"). We have reviewed these claims and determined that they are unpersuasive. First, Rafeeldeen claims that his encounter with Jeevakumar created a social group consisting of the two of them. This fails under our case law, which typically requires that a social group be comprised of people who possess "immutable characteristics" or those who "possess a characteristic that is capable of being changed but is of such fundamental importance that individuals should not be required to modify it, e.g., religion." *Escobar v. Gonzales*, 417 F.3d 363, 367 (3d Cir. 2005). Second, Rafeeldeen does not qualify for withholding of removal because he has not demonstrated a "clear probability" that he will face persecution if returned to Sri Lanka. *INS v. Stevic*, 467 U.S. 407, 430 (1984) (internal quotation marks omitted). Third, Rafeeldeen is ineligible for CAT relief because he has failed to carry his burden to show that it is "more likely than not" he would be tortured if returned to Sri Lanka. *Kamara v. Attorney Gen.*, 420 F.3d 202, 212 (3d Cir. 2005) (internal quotation marks omitted). Finally, we reject Rafeeldeen's contention that the Immigration Judge was not a neutral arbiter, as the record does not support the claim. As a result, we deny the petition for review with respect to all claims other than the one for asylum based on an imputed political opinion.

*Mohamed Rameez Rafeeldeen v. Attorney General of the United States of America*
No. 15-1374

HARDIMAN, *Circuit Judge*, dissenting.

In his petition for review, Rafeeldeen claimed he was beaten by the Sri Lankan government because of his imputed political support for the Liberation Tigers of Tamil Eelam (LTTE). The Immigration Judge and the Board of Immigration Appeals held that Rafeeldeen's testimony was credible, but nevertheless denied him relief because he failed to establish that the persecution visited upon him was on account of an imputed political opinion. My colleagues reverse the agency by noting that Rafeeldeen showed that his imputed political opinion played more than a "superficial" role in his treatment. Maj. Typescript at 3. Because that standard of review is insufficiently deferential to the agency, I respectfully dissent.

I

The Majority acknowledges, in the first footnote of its opinion, that we review the decisions of the IJ and the BIA for substantial evidence. Although there are appeals in which "the name given to the standard of review may be more symbolic than outcome determinative," *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 940 (7th Cir. 1989) (en banc) (Easterbrook, J.), this is not one of them. Accordingly, I think a more detailed explication of our deferential standard of review is required.

Whether an asylum applicant has demonstrated past persecution based on a protected ground is a factual determination we review for substantial evidence. *Mulanga v. Ashcroft*, 349 F.3d 123, 131 (3d Cir. 2003). And this factual determination is entitled to

1

"broad deference." *Khan v. Att'y Gen.*, 691 F.3d 488, 496 (3d Cir. 2012). "We will uphold the findings of the BIA to the extent that they are supported by reasonable, substantial[,] and probative evidence on the record considered as a whole, and will reverse those findings only if there is evidence so compelling that no reasonable factfinder could conclude as the BIA did." *Kayembe v. Ashcroft*, 334 F.3d 231, 234 (3d Cir. 2003). In other words, "the BIA's finding must be upheld unless the evidence not only supports a contrary conclusion, but *compels* it." *Abdille v. Ashcroft*, 242 F.3d 477, 484 (3d Cir. 2001) (emphasis added).

Under this standard, Rafeeldeen must show that he is unwilling or unable to return to his country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). It is well established that an imputed political opinion qualifies as a protected ground. *See Lukwago v. Ashcroft*, 329 F.3d 157, 181 (3d Cir. 2003). But under the REAL ID Act, Rafeeldeen is required to show that this protected ground was "at least one *central* reason" behind his alleged persecution. 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added). This makes evidence of the Sri Lankan authorities' motive "critical." *Lie v. Ashcroft*, 396 F.3d 530, 535 (3d Cir. 2005).

A

In my view, substantial evidence supports the agency's determination that any political opinion imputed to Rafeeldeen was not a central reason for the abuse he suffered. Rafeeldeen was beaten in connection with a police investigation into another man—Jeevakumar—whom the Sri Lankan government believed to be an LTTE spy.

2

Rafeeldeen's own testimony is replete with statements suggesting that the Sri Lankan police focused on discovering information Rafeeldeen had on Jeevakumar. For example, when Rafeeldeen was initially stopped and detained, he was asked "why [he was] accompanying" the tour group and what his "relationship" was with them. App. 94. This investigation did not impute any political opinion to Rafeeldeen. Likewise, with respect to his subsequent re-detention shortly after his initial release, Rafeeldeen explained that the police told him that they suspected Jeevakumar to be an LTTE supporter who had come to the region "to give information to the Tigers." App. 97–98. The police asked Rafeeldeen "how [he] helped" the Germans and Jeevakumar and ordered him to report to the police station weekly "*until they arrest Jeeva Kumar*." App. 99–100 (emphasis added). Once again, the sole motivation of the police, in light of Rafeeldeen's own words, appears to have been a law enforcement interest in capturing a terrorist suspect about whom the police believed Rafeeldeen had information.

Rafeeldeen's description of his 2007 run-in with the Sri Lankan authorities likewise displays a single-minded police focus on locating Jeevakumar and his affiliates. As Rafeeldeen recounted it: "[The officer] showed Jeeva Kumar's ID card and . . . he asked me whether the German people brought money to the LTT[E] and how much money [I] got to help them. They tortured me and asked me the German people's address." App. 104. By all appearances, the authorities pursued Rafeeldeen because they believed he had information on Jeevakumar, not because they imputed disfavored political views to him. Indeed, Rafeeldeen told the IJ that his concern after his release was that "if [the police] don't arrest Jeeva Kumar, they're definitely going to take me

3

again." App. 106. And finally, when the IJ asked Rafeeldeen whether the "only questions [the authorities] wanted [Rafeeldeen] to answer [were] where Kumar was and how they could find him," Rafeeldeen undermined his own case by responding: "I think so." App. 123.

Obviously, the police suspected Rafeeldeen of hiding something and used deplorable tactics in order to prompt him to give up the goods on Jeevakumar. But it is far from clear that the police actually attributed a political view to Rafeeldeen and a reasonable factfinder could conclude they did not. Hence, I would hold that substantial evidence supports the agency's conclusion that an imputed political opinion was not a central reason motivating Rafeeldeen's mistreatment.

In this respect, the Majority compounds its standard-of-review error with another: its confusion of the "central reason" component of the analysis. The Majority purports to require Rafeeldeen to "show that an imputed political opinion was at least a principal reason for his treatment," Maj. Typescript at 4, but it actually requires much less. As I shall explain, there is little evidence that imputation of a political view was a *principal* motivation of the Sri Lankan authorities—certainly not enough to render the agency's conclusion unreasonable.

Drawing on our decision in *Ndayshimiye v. Attorney General*, the Majority seems to suggest that under the "central reason" test, imputation need only be more than "'incidental, tangential, or superficial' as a motive." Maj. Typescript at 3 (quoting 557 F.3d 124, 130 (3d Cir. 2009)) (emphasis added). I cannot agree.

4

In *Ndayshimiye* we affirmed the BIA's interpretation that "the protected ground cannot play a minor role in the alien's past mistreatment or fears of future mistreatment" and "cannot be incidental, tangential, [or] superficial." *In Re J-B-N- & S-M*, 24 I. & N. Dec. 208, 214 (BIA 2007). But in agreeing with the BIA that a central reason "cannot be merely 'incidental or tangential to the persecutor's motivation,'" *id.*, we did not *equate* a "central" reason with one that barely surpasses the "incidental, tangential, or superficial." After all, we explained that "central" means "of primary importance," "essential," or "principal." *Ndayshimiye*, 557 F.3d at 130.[1] Although we recognized that "Congress, in including the term 'central,' meant to preclude asylum where a protected ground played only an incidental, tangential, or superficial role in persecution," we did not hold that anything beyond the latter descriptors—which we classified as "antonym[s] of 'central'"—automatically confers centrality. *Id.* Stated differently, the fact that *A* and *B* are polar opposites does not mean that *C* must be one or the other. Rather than exploring the scope of the space between the two poles, we simply stated that "the word 'central' would be rendered *superfluous* if asylum could be granted where a protected ground played any part, no matter how small, in motivating the persecution of the applicant." *Id.* at 131 (emphasis added). That's a far cry from *defining* "central" as anything more than "incidental, tangential, or superficial," as the Majority effectively does today. Maj. Typescript at 3.

---

[1] *See also Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 (3d Cir. 2015) ("For a protected characteristic to qualify as 'one central reason', it must be an essential or principal reason for the persecution.").

B

In any event, to the extent that the Sri Lankan authorities associated Rafeeldeen with the LTTE, substantial evidence supports the conclusion that any political attribution was not a more-than-superficial reason for their harsh treatment of Rafeeldeen. As I explained previously, the record suggests that the police focus remained on ascertaining the whereabouts of Jeevakumar. In concluding that Rafeeldeen established imputation, the Majority notes that Rafeeldeen testified that Sri Lankan authorities had called him a "Tiger supporter" and a "traitor," and had "'curse[d]' him because he is a Tamil-speaking Muslim who 'helped the LTTE.'" Maj. Typescript at 4 (quoting App. 103, 106, 108). The Majority also relies on Rafeeldeen's credible testimony that he believed that the authorities suspected him of "being part of the LTTE, even a spy." *Id.* (quoting App. 119). In addition, the Majority finds it significant that Rafeeldeen was re-detained in 2007 and released only on the condition that he report weekly for questioning until Jeevakumar's capture.

The Majority's analysis of these portions of testimony ignores important context. Rafeeldeen did testify that a Sri Lankan officer accused him of being a "Tiger supporter" during his 2007 detention—the strongest piece of testimony in his favor—but the Majority overlooks the fact that this statement was made in the context of that officer's display of Jeevakumar's ID card and his demands that Rafeeldeen disclose whether the Germans brought money to the LTTE, how much money Rafeeldeen received from them, and where the suspects were located. And although Rafeeldeen was scolded as a "traitor" in the course of his weekly reports to the police station, App. 106, "there is no reason to

6

believe that the 'traitor' label applied by police reached beyond the accusations that [Rafeeldeen] helped [suspected] terrorists, [or] had information regarding their activities." *(Kamalpal) Singh v. Holder*, 764 F.3d 1153, 1167 (9th Cir. 2014) (George, J., dissenting in part and concurring in part). The evidence suggests that the police conduct amounted to "interrogation to gain information" about Jeevakumar—not interrogation imputing that Rafeeldeen's political opinions "made him a terrorist suspect." *Id.* That Rafeeldeen credibly testified that he *personally believed* that the authorities suspected him of "help[ing] the LTTE" and "being part of the LTTE," Maj. Typescript at 4 (quoting App. 108, 119), is of no moment. "[W]e accept [Rafeeldeen's] recitation of the facts"— not the subjective, quasi-legal inferences he draws from those facts. *Lukwago*, 329 F.3d at 164.

The Majority also reads too much into Rafeeldeen's 2007 re-detention. The fact that the police retained interest in Rafeeldeen and asked him to report to them weekly until Jeevakumar was arrested does not mean that they imputed to him a political opinion. Indeed, "[i]t is a case of the police taking [Rafeeldeen's experience with] a suspected terrorist to its logical extension—that [he] would have useful information about that terrorist. That the police crossed all boundaries in pursuing that lead does not change the factor motivating them." *(Kamalpal) Singh*, 764 F.3d at 1167 (George, J., dissenting in part and concurring in part). In sum, there is little reason to believe that the basis for the statements and accusations cited by the Majority went beyond the authorities' interest in gaining information about Jeevakumar and his companions. And even assuming,

*arguendo*, that this were the better view, the record does not *compel* the conclusion that a principal reason for Rafeeldeen's mistreatment was an imputed political opinion.

Finally, I am unpersuaded by the authorities cited by the Majority. It is true that in (*Kulvier*) *Singh v. Gonzales*, even though "the police also had a legitimate law enforcement motivation," Maj. Typescript at 4, we concluded that their actions were "motivated in significant part by the police's desire to punish Singh and his father for the father's political activities regardless of any legitimate law enforcement purpose," 406 F.3d 191, 198 (3d Cir. 2005). But the similarities stop there. Under the pretense of searching for illegal weapons, the Indian police beat Singh and his father, repeatedly mentioning his father's Sikh separatist political activism, chastising Singh and his father for his father's continued failure to stop his activism despite prior beatings and warnings, and threatening that if the father did not cease his political activities, they would kill Singh. *Id.* at 194. Here, in contrast, the authorities' references to the LTTE when interrogating Rafeeldeen reflect insistence that he provide them information on Jeevakumar; they do not compel the conclusion that the police actually imputed LTTE views to Rafeeldeen and were centrally motivated by that imputation in mistreating him.[2]

---

[2] The other decisions cited by the Majority are inapposite as well. In *Ratnam v. INS* the police clearly imputed LTTE political views to Ratnam, given that they "repeatedly demanded that he admit to being a Tiger." 154 F.3d 990, 992 (9th Cir. 1998). This imputation was unsurprising in light of the fact that, following a chase, the Sri Lankan navy captured Ratnam on an LTTE weapons-transportation boat, accompanied by two dead Tigers who had ingested cyanide capsules. *Id.* Likewise, the BIA's finding of imputation in *In Re S-P-* rested upon distinctive facts—the Sri Lankan army had discovered the asylum applicant in a raid on an LTTE camp (where the applicant had been forced by the LTTE to work), and in his subsequent imprisonment the applicant was "repeatedly accused of being a Tiger." 21 I. & N. Dec. 486, 487–88 (BIA 1996).

My colleagues are correct that the Ninth Circuit case of *(Kamalpal) Singh v. Holder* is uncannily similar to this one. But I find Judge George's dissent in that case much more persuasive. There, as here, the fact that "the authorities' questioning was single-mindedly focused on eliciting information about a suspected terrorist," Maj. Typescript at 6, should be dispositive under substantial evidence review guided by a proper understanding of the centrality standard.[3] Singh's "uncontroverted answers show[ed] that he was persecuted 'only' because he had employed [a suspected terrorist (Khan)] and because the police wanted to find out information regarding Khan." *(Kamalpal) Singh*, 764 F.3d at 1165 (George, J., dissenting in part and concurring in part). And there, as here, "[t]he lack of interest by police in Singh's political opinion

---

Rafeeldeen was not discovered in such compromising circumstances, and his subsequent interrogations naturally reflect references to his knowledge of a suspected LTTE terrorist—but not any imputation of LTTE views to Rafeeldeen himself or mistreatment centrally motivated by such imputation.

Though they are distinguishable on their own terms, is also worth noting that *(Kuliver) Singh*, *Ratnam*, and *In re S-P-* were not "central reason" analysis cases—the relevant test required the persecution only to have been motivated at least in part by a protected characteristic. *(Kuliver) Singh*, 406 F.3d at 197; *Ratnam*, 154 F.3d 990 at 996; *In re S-P-*, 21 I. & N. Dec. at 490–91.

[3] The *(Kamalpal) Singh* majority's characterization of the dissent as making "the extraordinary claim that the police *could not have imputed a political opinion* to Singh because they interrogated him for information about [the suspected terrorist]" is both wrong and telling. *(Kamalpal) Singh*, 764 F.3d at 1162 n.7 (Reinhardt, J.) (emphasis added) (quoted in Maj. Typescript at 6). It's wrong because it's a *mis*characterization: of course motives can be mixed in the interrogation context, and an improper motive can serve as the basis for asylum if it is also a central one. The dissent merely concluded that the evidence was "devoid of any interest by the police about Singh's own political opinions." *Id.* at 1168 (George, J., dissenting in part and concurring in part). The characterization is telling because of its infidelity to the standard of review: our task is not to determine whether the authorities *could or could not have* attributed a political view; it's whether the agency was *compelled* to conclude that they did.

9

[wa]s only punctuated by the fact that the police released Singh after each arrest and interrogation upon the payment of a bribe." *Id.* at 1168 (George, J., dissenting in part and concurring in part). This behavior is, at least on one reasonable view, inconsistent with persecution based on imputed political opinion.

In this vein, the Majority suggests I oppose the view that "it is not *what* the Sri Lankan authorities asked Rafeeldeen about (Jeevakumar), but *why* they were asking the questions (because they mistakenly believed Rafeeldeen was an LTTE supporter) that determines our outcome." Maj. Typescript at 7. Not quite. My disagreement lies not in the Majority's articulation of this principle, but in its application of it. By using the phrase "on account of," the REAL ID Act undoubtedly "makes motive critical." *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992). Consequently, our inquiry should focus on *why* the authorities pursued Rafeeldeen. Because we cannot discern with clairvoyance the subjective motivations of the Sri Lankan police, we must examine *what* the authorities asked Rafeeldeen in order to arrive at an inference of *why* they mistreated him. For this reason, we require asylum applicants to "provide *some* evidence of [motive], direct or circumstantial," *id.*—a "what" that is lacking in this case.

As I have explained, I do not find the evidence of imputation and motivation compelling enough to render unreasonable the agency's conclusion that an imputed political belief was not a central reason behind Rafeeldeen's mistreatment. Indeed, denying Rafeeldeen's petition would accord with our precedents in this area. *See, e.g.*, *Amalfi v. Ashcroft*, 328 F.3d 719, 727 (3d Cir. 2003) (mere "mention of religion in the fabric of the story [of the alleged persecution] is insufficient to establish a persecution

10

claim"); *Shardar v. Ashcroft*, 382 F.3d 318, 324 (3d Cir. 2004) (finding that substantial evidence supported the denial of asylum even though officers made politically motivated comments while beating the applicant because the evidence suggested that he "was not persecuted on account of his political opinion; rather, he was legitimately prosecuted for participation in a violent political demonstration"). Accordingly, I would hold that the agency did not err when it determined that Rafeeldeen failed to establish that the Sri Lankan authorities attributed a political view to him and were centrally motivated by that attribution in persecuting him.

## II

Because I believe that substantial evidence supported the agency's conclusion that Rafeeldeen did not carry his burden to show past persecution on a protected ground, he was not entitled to a rebuttable presumption that he has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1); *Toure v. Att'y Gen.*, 443 F.3d 310, 317 (3d Cir. 2006). Thus, Rafeeldeen had the burden of demonstrating that he has a genuine subjective fear and that "a reasonable person in his position would fear persecution" based on a protected ground were he to return to Sri Lanka. *Huang v. Att'y Gen.*, 620 F.3d 372, 381 (3d Cir. 2010).

Here again, the burden of proof and our standard of review are critical. Although I would be inclined to agree with the Majority were the burden on the Government, the burden should fall on Rafeeldeen, and substantial evidence supports the agency's determination that he did not carry it. The record evidence shows that the Tamil Tigers were defeated in 2009. Although State Department reports indicate that some human

11

rights abuses against LTTE sympathizers linger, there was no evidence that the Sri Lankan government would target Rafeeldeen individually, and he conceded to the IJ that the police have not looked for him for several years. *See Quao Lin Dong v. Att'y Gen.*, 638 F.3d 223, 232 (3d Cir. 2011) (upholding the agency's rejection of an asylum claim where, *inter alia*, the petitioner had "failed to show that [her persecutors] were still looking for her"). Regardless, even if Rafeeldeen were to establish an objectively reasonable fear that the Sri Lankan authorities would come after him again were he to return to Sri Lanka, for the reasons I have stated, substantial evidence supports the agency's conclusion that it would not be based on a protected ground.

* * *

If we were reviewing this case de novo, I might have no quarrel with my colleagues' assessment of the evidence that Rafeeldeen was persecuted on account of imputed political opinion and that imputed political opinion was a "central reason" for the persecution. But because we owe "broad deference" to the record, *Khan*, 691 F.3d at 496, and ask only whether no reasonable person could conclude that Rafeeldeen's treatment—terrible as it was—was not centrally motivated by a political opinion the Sri Lankan government imputed to him, I respectfully dissent.